UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **M/G TRANSPORT SERVICES, LLC,** | **CIVIL ACTION** |
| **VERSUS** | **NO. 09 - 7927** |
| **NORTHERN ASSURANCE COMPANY OF AMERICA, ET AL.** | **SECTION "C"(1)** |

# OPINION[1]

This matter was tried before the Court without a jury. Having reviewed the evidence, the testimony, the record, the memoranda of counsel and the law, the Court finds in favor of Defendant/Third-Party Plaintiff, Northern Assurance Company of America, for the following reasons.

## I. Background

This litigation arises out of the sinking of the barge KMM-103, which was owned by M/G Transport Services and insured by Northern Assurance Company of America and International Marine Underwriters ("IMU"). (Rec. Doc. 75 at 1). M/G Transport filed suit against IMU for recovery after the sinking of the barge, and in turn, IMU filed a third party complaint against International Marine Terminals Partnership ("IMT"), in whose fleet the barge was stationed when it sank. *Id.* at 1-2. M/G Transport has recovered $728,600 pursuant to its insurance contract with IMU for the loss of the KMM-103 and is therefore no longer a plaintiff in this action. *Id.* at 2. IMU seeks recovery from IMT of the amounts paid for the loss of the KMM-103 for IMT's alleged negligence in connection with the loss of the barge. *Id.* at 2.

The KMM-103 arrived at IMT's fleet on the lower Mississippi River near Myrtle Grove,

---

[1] Sami Aboulhosn, a second year student at Tulane University Law School, contributed significantly to the research and preparation of this decision.

Louisiana, on December 26, 2007. *Id.* at 6.  Prior to its arrival, the KMM-103 had undergone repairs in which the wing tanks of the barge were patched. *Id.* at 5.  The KMM-103 was subsequently loaded with petroleum coke at Exxon's facility in Baton Rouge, Louisiana and transported to IMT's facility by the M/V MERLIN BANTER, a vessel not owned by M/G Transport. *Id.* at 6.  After being loaded in Baton Rouge, an independent inspection revealed that the KMM-103 had a freeboard of over 25 inches.[2]  (Rec. Doc. 34 at 1).

Upon its arrival at IMT's fleet, IMT inspected the KMM-103, but no documentation exists detailing the freeboard of the barge at the time of arrival.  (Rec. Doc. 84 at 76).  After the inspection, IMT accepted the KMM-103 into its fleet. IMT representatives testified that inspections of the entire fleet were made every twelve hours, though again the documentation of these vessel logs is missing for the days in which the KMM-103 was in the fleet. *Id.* at 101.  On December 31, 2007, Captain Bowie of IMT found that the freeboard of the KMM-103 was approximately 2-3 inches; he then decided to inspect the compartments of the KMM-103 and found approximately one foot of water in the stern compartment of the barge. *Id.* at 133.  He ordered his men to pump the water out, and noted that this action did not change the freeboard. *Id.*  Sometime after Captain Bowie's inspection, IMT moved an outside barge away from the KMM-103, thus exposing the KMM-103 to the wave and wake action of the Mississippi River.  (Rec. Doc. 75 at 6).  At no time while the KMM-103 was in its fleet did IMT attempt to communicate with M/G Transport regarding the status of the barge. *Id.*  On January 2, 2008, IMT discovered that the KMM-103 was missing and later determined that it had sunk while in the IMT barge fleet. *Id.*

---

[2]Freeboard is defined by Merriam-Webster as the distance between the waterline and the main deck of a ship. *Merriam-Webster Dictionary* (11th ed. 2003).  Witness testimony explains freeboard as "the portion of the hull that's exposed above the water, between the water and the deck; basically, the side of the barge that you can see." (Rec. Doc. 84 at 24).  Testimony from an IMT official also indicates that 18 inches is considered an "industry standard" for a safe level of freeboard.  (Rec. Doc. 84 at 89).

## II. Law and Analysis

The issue in this case is whether IMT, as bailee of the KMM-103, is at fault for the sinking of the KMM-103. Under maritime law, when a barge is placed into a fleet for eventual discharge, "a bailment results for the mutual benefit of the owner of the vessel and the operator of the wharf or dock." *Stegemann v. Miami Beach Boat Slips, Inc.*, 213 F.2d 561, 564 (5th Cir. 1954). As a general matter in a bailment relationship, "[t]he burden of proof of negligence is on the bailor, but by proving that the vessel was delivered to the bailee in good condition and damaged while in his possession, the bailor makes out a prima facie case of negligence." *Id.* In that case, the burden of proof shifts to the bailee, who can rebut the presumption of negligence only by proving "that it had no more knowledge of the cause of the casualty than was available [to the owner of the vessel] and that it exercised ordinary care." *Sisung v. Tiger Pass Shipyard Co.*, 303 F.2d 318, 322 (5th Cir. 1962). The applicable law therefore requires a two part analysis in order to attribute the presumption of fault in a bailment situation. The Court must first determine whether the vessel was delivered in good condition, and therefore whether the burden of proof shifted onto the bailee. *Stegemann*, 213 F.2d at 564. If this first test is met, then the bailee can rebut the presumption of negligence only by demonstrating that it had no more knowledge of the perilous condition of the barge than was available to the owner and that it exercised ordinary care. *Sisung*, 303 F.2d at 322.

*A. Delivery in Good Condition*

IMU argues that the KMM-103 was delivered in good condition. *See Stegemann*, 213 F.2d at 564. An independent survey reveals that the barge was loaded with 25 inches of freeboard when it left Exxon's facility in Baton Rouge. (Rec. Doc. 34 at 1). Neither party contests this fact. (Rec.

Doc. 84 at 62-63). The M/V MERLIN BANTA, the independent carrier who transported the barge from Baton Rouge to the IMT facility, documented no problems with loss of freeboard during the voyage, though sources on both sides testify that a loss of 18 inches of freeboard would have been a serious cause for concern. (Rec. Doc. 49 at 1); (Rec. Doc. 84 at 34, 198). Furthermore, no witness with personal knowledge of the arrival freeboard has testified that the KMM-103 arrived with fewer than 25 inches of freeboard. (Rec. Doc. 90 at 2).

The Court is satisfied that IMU has met its burden of proving that the KMM-103 arrived in good condition. *See Stegemann*, 213 F.2d at 564. IMT offers only the testimony of Gary Voiron, its terminal manager, who alleges that the KMM-103 arrived at IMT's fleet with fewer than six inches of freeboard. (Rec. Doc. 84 at 75). However, Mr. Voiron concedes that his testimony is not based on personal observation because he did not actually see the barge when it entered the fleet. *Id.* at 76. The only witness who did personally oversee the KMM-103 during its arrival, the arriving tugboat captain, did not testify at trial. *Id.* at 76-78. Furthermore, IMT has failed to produce any documents with a record of the freeboard of the KMM-103 upon its arrival into the fleet. *Id.*

In summary, IMU has proven that the KMM-103 left Baton Rouge with 25 inches of freeboard. (Rec. Doc. 34 at 1). The independent transporters of the KMM-103 reported no significant loss of freeboard on the voyage from Baton Rouge to IMT's fleet. (Rec. Doc. 49 at 1). Since IMT has not offered any credible evidence to prove that the KMM-103 arrived with fewer than 25 inches of freeboard, this Court is satisfied that IMU has met its burden of proving that the KMM-103 arrived at IMT's fleet in good condition. *See Stegemann*, 213 F.2d at 564.

*B. No More Knowledge and Ordinary Care*

Having determined that the KMM-103 was delivered to IMT in good condition, the next question is whether IMT can rebut the presumption of negligence by proving that it had no more knowledge of the barge's perilous condition than did M/G Transport and that it exercised ordinary care. *Sisung*, 303 F.2d at 322. While the KMM-103 was in its custody, IMT had sole supervision over the barge. (Rec. Doc. 84 at 36-39). Moreover, IMT conducts inspections of all the barges in its fleet every twelve hours. *Id.* at 101-02. During one of these inspections, an IMT captain noticed that the freeboard on the KMM-103 had decreased to 2-3 inches, prompting him to pump water out of one of the compartments; however, that action did not change the freeboard of the barge. *Id. at* 133. These facts suggest that IMT had unique knowledge of the perilous condition of the KMM-103, and that knowledge was unavailable to M/G Transport because the barge was located in IMT's fleet and in its exclusive custody. *See Sisung*, 303 F.2d at 322.

Since IMT had more knowledge than M/G Transport of the condition of the KMM-103, the next issue is whether IMT exercised ordinary care to prevent damage while the barge was in its fleet. *Id.* "Part of the fleeter's obligation entails recognizing when such barges become in serious danger of capsizing or sinking and taking available measures for the safety of the barge." *Noonan Constr. Co. v. Federal Barge Lines, Inc.*, 453 F.2d 637, 641 (5th Cir. 1972). This Court finds that IMT breached its duty of ordinary care. First, Captain Bowie failed to take any actions to prevent the KMM-103 from sinking despite noticing that pumping water out of the stern compartment did not raise the freeboard of the barge. *Id.* at 133. IMT could have taken numerous corrective measures at this point to prevent the casualty, such as unloading the barge ahead of routine schedule or using a crane barge to lighten the load of the KMM-103 by storing some of its cargo in an empty barge. (Rec. Doc. 84 at 41). Second, an IMT official later ordered the removal of an outside barge, exposing the KMM-103 to the wake and wave activity of the Mississippi River, which allowed for waves to

5

go over the top of the decks and possibly fill up the wing tanks of the barge. (Rec. Doc. 75 at 6); (Rec. Doc. 84 at 113). This exposure to the Mississippi River constituted a breach of ordinary care because IMT had documentation of the perilous condition of the barge at this point from Captain Bowie's inspection just days before. *See Sisung*, 303 F.2d at 322. Lastly, and most significantly, amidst all these activities and the ever decreasing freeboard of the KMM-103, IMT never deemed it prudent to contact M/G Transport about the condition of its barge in the fleet. (Rec. Doc. 84 at 36-37). An M/G Transport official testified that if M/G Transport had been aware of the low freeboard levels, it could have ordered that the actions listed *supra* be taken to prevent the casualty of the KMM-103. *Id.* at 41. For these reasons, IMT did not exercise ordinary care because it failed to recognize a dangerous situation and take adequate measures to protect the safety of the barge. *See Noonan*, 453 F.2d at 641.

### III. Conclusion

Accordingly,

IT IS ORDERED that judgment be entered in favor of Defendant/Third-Party Plaintiff, Northern Assurance Company of America, and against Third-Party Defendant, International Marine Terminal, in the amount of $728,600.00, with interest from the date of judicial demand.

New Orleans, Louisiana, this 1st day of July, 2011.

HELEN G. BERRIGAN  
UNITED STATES DISTRICT JUDGE